# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

May 7, 2020

**BY ECF**

The Honorable Judge Vernon S. Broderick
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

The government is directed to respond on 5/9/2020 before 5 p.m.

**SO ORDERED:**

HON. VERNON S. BRODERICK  5/8/2020
UNITED STATES DISTRICT JUDGE

**RE:**    **United States v. Idris Browning**
            **20 Cr. 02 (VSB)**

Honorable Judge Broderick:

Mr. Idris Browning respectfully moves the Court for an order granting his release from the Metropolitan Correctional Center or, in the alternative, a bail hearing to be held as soon as possible. This is Mr. Browning's first bail request in the course of his case.

Mr. Browning is needlessly languishing at the Metropolitan Correctional Center while COVID-19, a new and deadly strain of the coronavirus, ravages the jail, awaiting Government action in his case. On January 10, 2020, the Government indicated its intent to seek a superseding indictment in this matter. That was four months ago. To date, the Government has not presented its case to a grand jury. Certainly, coronavirus currently poses a significant hurdle to the Government's quest to secure a superseding indictment, as grand jurors are not currently convening. But that has not always been the case. The Government had at least two months before COVID-19 paralyzed the courts and devastated the MCC to seek a superseding indictment. Yet it never acted. The consequences of the Government's delay fall squarely on Mr. Browning, who must now wait until at least July 1, 2020 for any potential movement on his case. Mr. Browning should not have to suffer this time in a correctional facility ill-equipped to handle a global pandemic.

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). In light of the novel coronavirus and the nature of the pending charges, the following conditions will reasonably assure Mr. Browning's appearance in court and the safety of the community:

1. A personal recognizance bond in the amount of $50,000, to be signed by Mr. Browning and two financially responsible persons;

2. Pretrial Services supervision as directed by the Pretrial Services Office;
3. Travel restricted to the Southern District of New York and the Eastern District of New York;
4. Surrender all passports and other travel documents and make no applications for new or replacement documents;
5. Home detention at the residence of Natalie Morales, a family friend in the Bronx, enforced by electronic monitoring;
6. No contact, outside the presence of counsel, with any witnesses to the case.

## I.    Background

On December 19, 2019, Mr. Browning was arrested for allegedly stealing 4 cell phones and $40 United States currency from a mobile phone store, in violation of 18 U.S.C. §§ 1951 and 2. Mr. Browning was presented on a criminal complaint before Magistrate Judge Kevin N. Fox and reserved his bail application without prejudice to make a motion at a later date. Mr. Browning was detained at the Metropolitan Correctional Center, where he has remained since December 20, 2019.

The Government filed an indictment in this matter on January 2, 2020. On January 10, 2020, Mr. Browning appeared before Your Honor for arraignment on the indictment and entered a plea of not guilty. On that date, the Government indicated its intent to file a superseding indictment. The case was adjourned to March 13, 2020 for a status conference with the understanding that the Government would seek a superseding indictment in the interim. On March 4, 2020, the Government, without objection from the defense, filed a letter motion requesting that the Court adjourn the March 13, 2020 status conference to April 22, 2020 because the Government had not yet secured a superseding indictment. The Court granted the Government's request.

On March 13, 2020, the Bureau of Prisons closed its doors to all visitors for 30 days, citing public health concerns caused by the coronavirus. In light of the ongoing global pandemic, the Metropolitan Correctional Center remains closed to visitors indefinitely.

On April 17, 2020, the Government, again without objection from the defense, filed a letter motion requesting that the Court adjourn the April 22, 2020 status conference until July 1, 2020. The request for adjournment stemmed from the Government's failure to secure a superseding indictment before April 22, 2020 and the hope that it may be able to do so by July 1. The matter was adjourned to July 1, 2020 at 10am.

## II.    The Bail Reform Act governs Mr. Browning's bail motion.

The Bail Reform Act presumes the pretrial release of individuals charged with federal crimes. Under the Act, the Court may detain an individual before trial only upon a showing by the Government "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1); *United States v. Paulino*, 335 F. Supp. 3d 600, 609 (S.D.N.Y. 2018) (detailing the history of the Bail Reform Act).

For the Court to detain Mr. Browning, the Government must prove by clear and convincing evidence that he is a danger to the community or establish by a preponderance of the evidence that he is a flight risk. *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985); *Paulino*, 335 F. Supp. 3d at 610. "To find danger to the community under this standard of proof requires that the evidence support such a conclusion with a high degree of certainty." *Chimurenga*, 760 F.2d at 405.

To determine whether to release or detain an individual pretrial, the Court should consider the factors enumerated in 18 U.S.C. § 3142:

> These factors include (1) "the nature and circumstances of the offense charged;" (2) "the weight of the evidence against the person;" (3) "the history and characteristics of the person" including, among other factors, family ties, employment, financial resources, past conduct, criminal history, and whether the person was on release pending trial; and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."

*Paulino*, 335 F. Supp. 3d at 610.

For the reasons discussed herein, the Government cannot prove there are no conditions that could reasonably assure the safety of the community and Mr. Browning's return to court. Accordingly, the Court should release Mr. Browning on the conditions proposed by the defense.

### III.    The COVID-19 outbreak compels Idris Browning's release from the Metropolitan Correctional Center.

Among the factors the Court must consider when "determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community" is a person's "physical and mental condition." 18 U.S.C. § 3142(g)(3)(A). Given the ongoing public health crisis posed by COVID-19, Mr. Browning's physical wellbeing is at risk if he remains incarcerated. *See generally* Exhibit A, Affidavit of Jonathan Giftos, M.D. He must be released.

In the months since Mr. Browning first appeared before Your Honor, the world has changed immeasurably. "[T]he unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic" threatens Mr. Browning's physical health while incarcerated at the Metropolitan Correctional Center. *See United States v. Stephens*, 15-CR-95 (AJN) (Mar. 19, 2020).

> We are in the midst of an unprecedented pandemic. COVID-19 has paralyzed the entire world. The disease has spread exponentially, shutting down schools, jobs, professional sports seasons, and life as we know it. It may kill 200,000 Americans and infect millions more. At this point, there is no approved cure, treatment, or vaccine to prevent it.

*United States v. Rodriguez*, No. 2:03-CR-00271-AB-1, 2020 WL 1627331, at *1 (E.D. Pa. Apr. 1, 2020) (granting defendant's compassionate release application).

Governor Andrew Cuomo has declared a State of Emergency in New York, and on March 20, 2020, the governor directed all non-essential workers to work from home and required individuals to maintain six feet of distance between each other.[1] Also on March 20, 2020, the Federal Emergency Management Agency (FEMA) declared New York State "a major disaster."[2] This global pandemic has spurred a public health crisis frequently likened to war. And for New York City residents, there is no end in sight.

The exponential rate of coronavirus infection is unparalleled. The first case of COVID-19 in New York State was announced on March 1, 2020. To date, the state has amassed 323,978 confirmed cases of the virus, with nearly 21,000 deaths.[3] In New York City, there are over 173,000 positive cases and nearly 14,000 deaths resulting from the virus.[4] As of April 10, 2020, New York State had more coronavirus cases than any other *country*.[5] And the majority of these cases are in New York City, making it an epicenter of the pandemic.[6]

Given what we know about COVID-19, the Bureau of Prisons' quest to contain the infection seems futile. Coronavirus is highly contagious. On average, one person with the coronavirus will infect between two to three other individuals.[7] In correctional facilities, the rate of infection is even greater.

Correctional facilities "are petri dishes for contagious respiratory illnesses."[8] Nationwide, COVID-19 has paralyzed the Bureau of Prisons and plagued its population. To date, 41 BOP

---

[1] *At Novel Coronavirus Briefing, Governor Cuomo Declares State of Emergency to Contain Spread of Virus*, New York State (Mar. 11, 2020) *at* https://on.ny.gov/2TKzIoz; *NYS on PAUSE Extended*, New York State Department of Health (Apr. 11, 2020), at https://coronavirus.health.ny.gov/home.

[2] President Donald J. Trump Approves Major Disaster Declaration for New York, FEMA (Mar. 20, 2020), at https://www.fema.gov/news-release/2020/03/20/president-donald-j-trump-approves-major-disaster-declaration-new-york.

[3] *Novel Coronavirus (COVID-19),* New York State Department of Health (last accessed May 7, 2020), at https://on.ny.gov/2vfFQvy (updating regularly).

[4] *Coronavirus*, New York City Health (last accessed May 6, 2020), at https://www1.nyc.gov/site/doh/covid/covid-19-data.page (updating regularly).

[5] Yelena Dzhanova, "New York State now has more coronavirus cases than any country outside the US," NBC News (Apr. 10, 2020), at https://www.cnbc.com/2020/04/10/new-york-state-now-has-more-coronavirus-cases-than-any-country-outside-the-us.html.

[6] *Coronavirus in N.Y.C.: Region Is Now an Epicenter of the Pandemic*, The New York Times (Mar. 23, 2020), at https://www.nytimes.com/2020/03/22/nyregion/Coronavirus-new-York-epicenter.html?action=click&module=Spotlight&pgtype=Homepage.

[7] *The average coronavirus patient infects at least 2 others, suggesting the virus is far more contagious than flu*, Business Insider (Mar. 17, 2020), at https://www.businessinsider.com/coronavirus-contagious-r-naught-average-patient-spread-2020-3.

[8] *Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*, Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration. *See also* Joseph A. Bick (2007).

inmates have lost their lives to the coronavirus.[9] At the Metropolitan Correctional Center, where Idris Browning is housed, nine inmates were tested for coronavirus; of those, five tested positive. *See* Exhibit B, May 7, 2020 Letter to Chief Judge Roslynn R. Mauskopf. Put differently, 56% of MCC inmates tested were confirmed to have contracted the virus. In addition, 40 MCC employees have tested positive for COVID-19. *Id.*



The disparity between the number of inmates who have tested positive for coronavirus and confirmed coronavirus cases among staff members—who, unlike inmates, do not rely on the facility for testing—suggests a severe under-testing of inmates at the MCC.

Conditions of pretrial confinement create the ideal environment for the transmission of coronavirus. Public health experts agree that incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[10] Courts have adopted this perspective. "Experts agree that pretrial detention facilities are poorly equipped to manage a crisis resulting from this potentially deadly, highly contagious novel coronavirus within their walls. By design, jails are not medical facilities." *United States v. Davis*, No. ELH-20-09, 2020 WL 1529158, at *5 (D. Md. Mar. 30, 2020) (ordering defendant's pretrial release in a presumption case in light of COVID-19). Accordingly, "prisoners and jail inmates are more

---

Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8): 1047-1055, at https://doi.org/10.1086/521910.

[9] *COVID-19 Coronavirus*, Bureau of Prisons (last accessed May 6, 2020), at https://www.bop.gov/coronavirus/ (updating regularly).

[10] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (Mar. 2, 2020), at https://bit.ly/2W9V6oS.

likely than the general population to report experiencing infectious diseases, indicating that these individuals face a heightened risk during this pandemic." *United States v. Kennedy*, No. 18-20315, 2020 WL 1493481, at \*1–2 (E.D. Mich. Mar. 27, 2020), *reconsideration denied*, No. 18-20315, 2020 WL 1547878 (E.D. Mich. Apr. 1, 2020) (granting pretrial release).

Because there is currently no vaccine or cure for COVID-19, the primary focus is prevention. To curtail new infections, the Centers for Disease Control and Prevention strongly recommends the following actions: thorough and frequent handwashing, cleaning surfaces with Environmental Protection Agency approved disinfectants, keeping at least six feet of space between people, and social distancing. *See* Exhibit A, Affidavit of Jonathan Giftos, M.D.

But the MCC simply cannot employ even the most basic CDC recommendations for preventing the spread of coronavirus. Maintaining six feet of distance from other inmates is impossible in a correctional facility where most individuals, including Idris Browning, are double-bunked, sharing a toilet and sink with their cellmate and a common shower—which is not regularly cleaned—with at least 16 other people.

In an effort to stem transmission of the coronavirus within federal correctional facilities, on March 13, 2020, the Bureau of Prisons announced a 30-day suspension of all visits to its jails and prisons. More recently, the MCC has implemented coronavirus screening protocols for staff and new inmates. *See* Exhibit B, May 7, 2020 Letter to Chief Judge Roslynn R. Mauskopf. But these policies are cold comfort in the face of a highly contagious virus that infected individuals may transmit while asymptomatic. "[T]here is no way to stop the daily flow of guards, teachers, food service and healthcare workers. Someone is certain to bring the virus in and take it back out while they are asymptomatic."[11] As Judge Brody in the Eastern District of Pennsylvania recognized, the Bureau of Prisons' assurances that it "can protect inmates ring hollow given that these measures have already failed to prevent transmission of the disease" at the facility where Mr. Browning is housed. *See United States v. Rodriguez*, No. 2:03-CR-00271-AB-1, 2020 WL 1627331, at \*8 (E.D. Pa. Apr. 1, 2020).

Mr. Browning's health is at risk if he remains incarcerated at the Metropolitan Correctional Center. On March 23, 2020, ten days after the facility closed to the general public, Mr. Browning was moved to an isolation tier in his housing unit. For 20 days, Mr. Browning was locked in a single cell by himself as those around him fell prey to the virus. While there, two of the inmates on Mr. Browning's tier tested positive for the coronavirus. Mr. Browning experienced symptoms of the coronavirus, including coughing and difficulty breathing, but was never tested.

A few weeks ago, Mr. Browning was moved to a different tier and placed in a double cell. Although the tier in his housing unit has not been designated as an isolation tier, at least one person in the tier—with whom Mr. Browning and others share a shower and phone—is in a cell marked "isolation." These scarlet letters indicate that the person in the cell has been officially isolated

---

[11] *Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*, Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration.

because he was known to have had contact with someone who tested positive for COVID-19. Despite this, Mr. Browning has not had his temperature taken since being placed on the tier.

In fact, while at the MCC, Mr. Browning has had limited access to basic sanitizing products. Recently, Mr. Browning went more than one day without soap after having run out. Because access to commissary has been irregular, Mr. Browning is expected to use a single bar of soap not only for showering, but also for handwashing and for washing clothing. Further, since the start of the pandemic, Mr. Browning has only once received cleaning supplies—a rag and disinfectant spray—to clean his cell. This is particularly troubling in a unit, like Mr. Browning's, where inmates exchange cells every 21 days. No one is instructed to clean his cell before transferring to another person's cell.

Even the phone in Mr. Browning's housing unit presents a public health hurdle. Mr. Browning shares one phone with 90 other people. Inmates use the same phone to contact their loved ones and speak with their legal counsel. But phone is poorly cleaned. None of the inmates are given anything to wipe down the phone before or after using it, maximizing the risk of spreading infection.

To be sure, Mr. Browning has not been diagnosed with any pre-existing medical conditions that make him particularly vulnerable to COVID-19. But he is not immune from contracting the virus or suffering its complications. At various points over the past few weeks, Mr. Browning has experienced shortness of breath and difficulty breathing. Medical professionals warn with increasing frequency that individuals of all ages are at risk for the coronavirus. An open letter signed by more than 75 medical health professionals cautioned, "young and otherwise healthy people are also becoming severely ill from COVID-19. This is not just a problem for the elderly and chronically-ill. It is a dangerous threat to all of us."[12] This is borne out by statistics. In New York City, 43% of people who tested positive for COVID-19 were ages 18 to 44 years old.[13] Indeed, a doctor at a New York City emergency department reported that over the course of one night, he "examined six patients who were exhibiting common symptoms of the novel coronavirus; five of them were in their 20s or early 30s."[14]

The exceptional risk the coronavirus poses to incarcerated individuals has compelled courts in the Southern District of New York and across the country to release previously detained individuals. *See Josefina Coronel, et al., Petitioners-Plaintiffs, v. Thomas Decker, et al., Respondents-Defendants. Additional Party Names: Jose Madrid, Jose Otero, Juan Morocho Sumba, Miguel Miranda*, No. 20-CV-2472 (AJN), 2020 WL 1487274, at *4 (S.D.N.Y. Mar. 27,

---

[12] Ben Conarck, "Dozens of Miami doctors plead with city to stay inside and take coronavirus seriously," The Miami Herald (Mar. 23, 2020), at https://www.miamiherald.com/news/coronavirus/article241430821.html.

[13] *Coronavirus*, New York City Health (Mar. 21, 2020), at https://on.nyc.gov/39ME7wU (updating regularly).

[14] Kerry Kennedy Meltzer, "I'm Treating Too Many Young People for the Coronavirus," The Atlantic (Mar. 26, 2020), at https://www.theatlantic.com/ideas/archive/2020/03/young-people-are-not-immune-coronavirus/608794/ ("A doctor at my own hospital said that he has never seen so many young people in the ICU as he's now seeing with COVID-19.").

2020). *See, e.g.*, *United States v. Stephens*, No. 15-cr-95 (AJN), 2020 WL 1295155, at *2 (S.D.N.Y. Mar. 19, 2020) ("[I]nmates may be at a heightened risk of contracting COVID-19 should an outbreak develop."); *United States v. Garlock*, 18-cr-418, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) ("By now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided. Several recent court rulings have explained the health risks—to inmates, guards, and the community at large—created by large prison populations. The chaos has already begun inside federal prisons ....") (citations omitted); *United States v. Fellela*, No. 3:19-CR-79 (JAM), 2020 WL 1457877, at *1 (D. Conn. Mar. 20, 2020) ("All levels of government nationwide have recently taken drastic measures in light of the COVID-19 pandemic to promote "social distancing" and to prohibit the congregation of large numbers of people with one another. But, as is true for most jails and prisons, the conditions of confinement at Wyatt are not compatible with these safeguards.").

Judge Torres recently observed, "The nature of detention facilities makes exposure and spread of the virus particularly harmful." *Basank v. Decker*, No. 20 CIV. 2518 (AT), 2020 WL 1481503, at *3 (S.D.N.Y. Mar. 26, 2020). Quoting a physician "who has worked extensively on infectious disease treatment and prevention in the context of jails and prisons," Judge Torres recognized that "the risk of COVID-19 to people held in New York-area detention centers…is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected." *Id.* (internal citation and quotation marks omitted). The Third Circuit has also weighed in, noting, "It goes without saying that prisons generally are crowded spaces and therefore are less than conducive to the practice of social distancing. During this rapidly evolving public health emergency, there are many valid concerns about the possibility of contagion in prisons." *United States v. Roeder*, No. 20-1682, 2020 WL 1545872, at *2 (3d Cir. Apr. 1, 2020) (reversing the District Court's denial of defendant's motion to postpone his self-surrender date in light of the coronavirus pandemic).

In the throes of this public health crisis, the Court must release Idris Browning to protect his physical health.

## IV.    Idris Browning does not pose a serious risk of flight.

The Government cannot prove by a preponderance of the evidence that there are no conditions that can be set to reasonably assure Idris Browning's appearance in court.

> Because the law thus generally favors bail release, the government carries a dual burden in seeking pre-trial detention. First, it must establish by a preponderance of the evidence that the defendant, if released, presents an actual risk of flight. *See United States v. Berrios–Berrios*, 791 F.2d 246, 250 (2d Cir. 1986). Assuming it satisfies this burden, the government must then demonstrate by a preponderance of the evidence that no condition or combination of conditions could be imposed on the defendant that would reasonably assure his presence in court. *See United States v. Shakur*, 817 F.2d at 195 ("The burden of proof is on the government to prove the absence of such conditions by a preponderance of the evidence."); *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985).

*United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007).

Born and raised in Queens, New York, Mr. Browning has lived in the New York City area for nearly his entire life. He has never traveled abroad and does not even possess a passport. The son of a police officer, Mr. Browning maintains a close relationship with his parents and his five brothers. Indeed, Mr. Browning's father came to support his son at his first and only post-indictment court appearance in January 2020, and has remained in close contact with defense counsel.

Idris relies heavily on his family, who live in the New York City area, for emotional and financial support. His parents are the guardians of Mr. Browning's two young children, who are a source of light for Mr. Browning. He has every incentive to remain in New York and abide by the conditions of release to maximize the potential that he may one day be a physical presence in his children's lives.

Before Mr. Browning's arrest, he maintained employment in the community. Mr. Browning worked for several months as a cashier for Bed, Bath and Beyond. He also worked as a crew member for Panera Bread in downtown Brooklyn and as an usher in a movie theatre.

Mr. Browning's strong community ties belie the notion that he poses a risk of flight. Even if the Court finds that Mr. Browning poses a risk of flight, the Government must still show by a preponderance of the evidence that there are *no* conditions that would *reasonably* assure his return to Court. The Government cannot meet this burden.

The conditions proposed by the defense include home detention at the residence of a family friend—not where he was living at the time of the alleged offense—and electronic monitoring. While Mr. Browning has in the past not returned to court when released pre-trial, he has never been supervised as a condition of his release. Certainly, Mr. Browning has never been released on the restrictive conditions proposed by the defense. Home detention, as contemplated by the defense, requires that Mr. Browning remain at home at all times and demands that he seek permission from a pretrial services officer before leaving the residence. The addition of electronic monitoring allows pretrial services—and the Court, by extension—to know whether Mr. Browning has violated the condition of home detention. And Mr. Browning has every incentive to comply. Given the inhumane conditions at the Metropolitan Correctional Center, he will not jeopardize his freedom and risk returning to jail.

Further, the coronavirus outbreak mitigates any potential risk of flight. Courts in districts with far fewer confirmed COVID-19 cases than New York have recognized that "the pandemic changes the calculus" concerning an individual's risk of flight. *United States v. Ramos,* 2020 U.S. Dist. LEXIS 52586 (D. Mass. March 26, 2020) (granting defendant's motion for pretrial release in view of the coronavirus). In *Ramos*, for instance, the court found that the defendant "cannot travel without a significant risk of exposure to the virus with the potentially severe health consequences that would follow, and therefore cannot readily flee the district." *Id.* The court in *United States v. Fellela* echoed, "Flight would be enormously more risky and complicated in light of the travel and commercial restrictions brought on by the COVID-19 virus." 2020 U.S. Dist.

LEXIS 49198 (D. Conn. March 20, 2020) (granting defendant's motion for release post-plea in view of the coronavirus).

This rationale applies with equal force to Mr. Browning. Certainly, COVID-19 dampens any argument that Mr. Browning would attempt to flee to evade the charges in this case. It is simply too dangerous. *See United States v. Lopez*, No. 19CR116KMWJLC, 2020 WL 1678806, at *2 (S.D.N.Y. Apr. 6, 2020) (releasing defendant post-plea, presentence, over Government objection, in light of dangers of coronavirus, noting "these are not ordinary circumstances").

### V.      Mr. Browning does not pose a danger to the community.

To detain Mr. Browning on dangerousness grounds, the Government must demonstrate by clear and convincing evidence that Mr. Browning is a danger to the community. "To find danger to the community under this standard of proof requires that the evidence support such a conclusion with a high degree of certainty." *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985). The Government cannot meet this burden.

First, the nature and circumstances of the offense charged do not demand detention. Mr. Browning is charged with one count of robbery for allegedly stealing four cell phones and $40 from a mobile phone store. Unlike the felonious conduct enumerated in subsection (f)(1) of the Bail Reform Act, violation of 18 U.S.C. § 1951, Hobbs Act robbery, is not sufficiently dangerous to warrant a presumption of detention. Thus, the law favors Mr. Browning's release based on the charged offense.

The nature of this particular offense is not especially violent. The criminal complaint alleges that a firearm was brandished during the commission of the offense. But the discovery belies this assertion. The audio of the 911 call from the store clerk immediately following the robbery and the accompanying sprint reports indicate that the complainant in this case did not see a gun. No firearm was brandished. In fact, the Government's theory of the case is that the perpetrator did not have or use a firearm in the commission of the offense. No one was physically injured during the commission of the offense.

Second, "the weight of the evidence against" Mr. Browning is insufficient to support detention. *See* 18 U.S.C. § 3142(g). Mr. Browning is alleged to have committed a robbery on November 25, 2020. But he was not arrested that day or the day after. In fact, two days after the incident, NYPD Crimestoppers received a tip—based on video surveillance of the incident—that someone other than Idris Browning committed the crime. Mr. Browning was not arrested for the offense until weeks later, in late December 2019.

Moreover, there is no physical evidence linking Mr. Browning to the robbery. There is no physical evidence that Mr. Browning was ever in the mobile phone store where the robbery occurred—no fingerprints were lifted from the scene. The stolen phones were not recovered from Mr. Browning's person or place of residence. There is no fingerprint or DNA evidence tying Mr. Browning to the stolen phones. In fact, evidence shows that hours after the incident, a different

person sold the stolen phones at an EcoATM near the scene of the incident. In short, it is far from clear that Mr. Browning is the actual perpetrator of this offense.

Third, Mr. Browning's history does not provide clear and convincing evidence that Mr. Browning, if released, poses a danger to the community. While Mr. Browning has a criminal history, his record does not reflect violence. In total, Mr. Browning has three misdemeanor convictions and one felony conviction for a non-violent offense. He has never served more than nine months in jail.

Given the circumstances, the conditions of release proposed by the defense would reasonably assure the safety of the community. Home detention guarantees that Mr. Browning is not out roaming the streets of New York; he will be at home, monitored electronically by pretrial services. As a practical matter, given the pandemic, commerce across the city is shut down for the foreseeable future, making it all but impossible for Mr. Browning to commit the type of crime charged in the indictment. Statistics bolster this argument. NYPD Commissioner Dermot Shea recently disclosed that "[c]rime has dropped off the face of the map really since the social distancing went into effect."[15]

## VI.    Conclusion

Mr. Browning's "interest in maintaining [his] liberty before trial is paramount, and an essential component of protecting the presumption of innocence." *United States v. Paulino*, 335 F. Supp. 3d 600, 603 (S.D.N.Y. 2018). Yet for the past several months, Mr. Browning has suffered abhorrent conditions of confinement while patiently awaiting a superseding indictment that has yet to come. In light of the current global pandemic and the nature of the charges pending against Mr. Browning, there are conditions that can be set to reasonably assure the safety of the community and Mr. Browning's return to court.

Accordingly, we respectfully request that the Court issue an order releasing Idris Browning on bail. In the alternative, we respectfully request a bail hearing for Mr. Browning as soon as possible. Thank you for your consideration of this matter.

Respectfully submitted,

*/s/ Marne L. Lenox*
Marne L. Lenox
Assistant Federal Defender
(212) 417-8721

---

[15] Beckie Strum, *Crime plummets in NYC amid lockdown, but not as much in neighborhoods hit hardest by the coronavirus*, Market Watch (Apr. 9, 2020), at https://www.marketwatch.com/story/crime-plummets-in-nyc-amid-lockdown-but-not-as-much-in-neighborhoods-hit-hardest-by-the-coronavirus-2020-04-09.